IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

| | | |
|---|---|---|
| MAUREEN TOOMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. |
| | ) | |
| SANOFI-AVENTIS U.S. INC. | ) | |
| F/K/A AVENTIS PHARMACEUTICALS | ) | |
| INC., F/K/A | ) | |
| HOECHST MARION ROUSSEL, INC.; | ) | |
| WALGREEN CO.; and | ) | |
| BOND DRUG COMPANY OF | ) | |
| ILLINOIS D/B/A WALGREEN CO., | ) | |
| a corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

NOW COMES Plaintiff, MAUREEN TOOMEY, by and through her attorneys POWER,

ROGERS & SMITH, P.C., and hereby complaining of Defendants, SANOFI-AVENTIS U.S. INC.

F/K/A AVENTIS PHARMACEUTICALS INC., F/K/A HOECHST MARION ROUSSEL, INC.

(hereinafter referred to as "SANOFI-AVENTIS"); and WALGREEN CO. and BOND DRUG

COMPANY OF ILLINOIS D/B/A WALGREEN CO. (hereinafter referred to as "WALGREENS"),

pleading hypothetically and in the alternative, states:

1. That prior to August 24, 2005, SANOFI-AVENTIS was a manufacturer of many

prescription drugs including, but not limited to, the drug commonly referred to as Ketek.

2. That prior to August 24, 2005, WALGREENS was a distributor of many prescription drugs

including, but not limited to, the drug commonly referred to as Ketek.



3. That on or about August 24, 2005, KIMBERLY RICUARTE was a licensed physician in the State of Illinois and all of its branches.

4.    That on or about August 24, 2005, KIMBERLY RICUARTE, prescribed a drug for MAUREEN TOOMEY commonly referred to as Ketek, 400 mg. for sinusitis.

5.    That on or about August 24, 2005, MAUREEN TOOMEY filled a prescription for Ketek, 400mgs. at WALGREENS, 2100 Green Bay Road, Evanston, Illinois, 60201.

6.    That on or about August 24, 2005, MAUREEN TOOMEY consumed the prescription drug commonly referred to as Ketek, 400mg. until about mid-September, 2005.

7.    That on or about September 11, 2005, MAUREEN TOOMEY's urine became dark, and she began to have other symptoms including nausea.

8.    That on or about September 11, 2005, MAUREEN TOOMEY was treated by Emily Gottlieb, M.D., who performed a urinalysis.

9.    That on or after September 11, 2005, results from the urinalysis of MAUREEN TOOMEY, found bile in her urine and stones in her gallbladder.

10.    That on or about September 16, 2005, MAUREEN TOOMEY was admitted to Evanston Hospital.

11.    That on or about September 16, 2005, Evanston Hospital, through an agent or employee, performed an ERCP which revealed MAUREEN TOOMEY had pancreatitis and an unknown caused hepatitis.

12.    That on or about October 21, 2005, MAUREEN TOOMEY was re-admitted to Evanston Hospital.

13.    That on or about October 21, 2005, a CT scan of MAUREEN TOOMEY

determined she had an extremely enlarged gallbladder from the hepatitis.

14.    That on or about October 21, 2005 continuing through December 12, 2005,

MAUREEN TOOMEY was treated with Augmentin.

15.    That on or about December 12, 2005, MAUREEN TOOMEY was admitted to

Evanston Hospital for laparoscopic Surgery.

16.    That in late February, 2006, MAUREEN TOOMEY started to experience

arthralgia, and consulted with Emily Gottlieb, M.D., and a neurologist at Evanston Hospital, and it

was determined she had carpal tunnel syndrome.

17.    That on or about May 9, 2006, MAUREEN TOOMEY was treated by Richard M.

Green, M.D., of Northwestern Memorial Hospital, and he diagnosed MAUREEN TOOMEY with auto

immune Hepatitis.

18.    That on or about May 12, 2006, MAUREEN TOOMEY checked into the Mayo

Clinic of Rochester, Minnesota, where they prescribed her with 40 mg. of Prednisone.

19.    That in August, 2006, MAUREEN TOOMEY was treated by Cheryl Wilkes, M.D.,

who told her she could not to return to work due to the stress.

20.    That in November, 2006, MAUREEN TOOMEY was treated by Mark Molitch,

M.D., and he told her all of her medical problems had returned.

21.    That on or about January 12, 2007, MAUREEN TOOMEY was treated by Christy

Park, M.D., who diagnosed her with inflammatory poly arthritis, which was a complication of her

auto immune hepatitis.

Page 3

22.   That on and prior to August 24, 2005, the drug manufacturer, SANOFI-AVENTIS, knew the drug Ketek caused adverse reactions including hepatitis, jaundice, chronic pain, as well as carpal tunnel syndrome, and is only to be used in mild to moderate cases of community-acquired pneumonia.

23.   That on and prior to August 24, 2005, the drug manufacturer, SANOFI-AVENTIS, was aware patients were prescribed and took Ketek were experiencing adverse reactions including hepatitis, jaundice, chronic pain, as well as carpal tunnel syndrome, and should not be used for sinusitis.

24.   There prior to August 24, 2005, there was no warning in the Physicians' Desk Reference on the package insert for the drug commonly referred to as Ketek regarding adverse reactions including hepatitis, jaundice, chronic pain, as well as carpal tunnel syndrome, and should not be used for sinusitis.

25.   That prior to August 24, 2005, there were no warnings to physicians, and consumers including the plaintiff from SANOFI-AVENTIS about Ketek causing adverse reactions including hepatitis, jaundice, chronic pain, as well as carpal tunnel syndrome, and should not be used for sinusitis.

26.   That on or about August 24, 2005, the package insert regarding the drug Ketek and the drug Ketek received by the pharmacist at WALGREENS and the Plaintiff, was in the same condition as when it left the manufacturer's, WALGREENS, control.

27.   That on or about August 24, 2005, the package insert regarding the drug Ketek and the drug Ketek given to MAUREEN TOOMEY by the pharmacist at WALGREENS did not

include any warnings about Ketek causing adverse reactions including hepatitis, jaundice, chronic

pain, as well as carpal tunnel syndrome, and should not be used for sinusitis.

28.    That on and prior to August 24, 2005, the manufacturer and distributor of

prescription drugs had a duty to warn consumers such as MAUREEN TOOMEY of the dangers and

adverse reactions of those drugs as well as indications for use.

29.    That the drug Ketek was unreasonably dangerous in one or more of the following

respects:

      a)    Did not warn about the side effects of Ketek including jaundice and chronic

          pain; or

      b)    Did not warn against the adverse reaction of hepatitis and carpal tunnel

          syndrome; or

      c)    Did not include that Ketek is only to be used in mild to moderately severe

          cases of community-acquired pneumonia; or

      d)    Was otherwise unreasonably dangerous.

30.    That as a proximate result of one or more of the foregoing unreasonably

dangerous conditions MAUREEN TOOMEY was injured, has experienced pain and suffering; has

been disabled and disfigured; has incurred expenses for medical, prescription, therapy, and other

similar expenses; and has lost wages.

WHEREFORE, Plaintiff, MAUREEN TOOMEY, by and through her attorneys, POWER,

ROGERS & SMITH, P.C., demands Judgment against Defendants, SANOFI-AVENTIS U.S. INC.

F/K/A AVENTIS PHARMACEUTICALS INC., F/K/A SANOFI-AVENTIS MARION ROUSSEL, INC.;

WALGREEN CO.; and BOND DRUG COMPANY OF ILLINOIS D/B/A/ WALGREEN CO., a

corporation, in a sum of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

POWER, ROGER & SMITH, P.C.

By: _____
     Joseph A. Power, Jr.

POWER, ROGERS & SMITH, P.C.
Attorneys for Plaintiff
70 West Madison Street, 55th Floor
Chicago, IL 60602
312/236-9381
Atty. Reg. 31444

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

| | |
|---|---|
| MAUREEN TOOMEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. |
| ) | |
| SANOFI-AVENTIS U.S. INC. ) | |
| F/K/A AVENTIS PHARMACEUTICALS ) | |
| INC., F/K/A ) | |
| HOECHST MARION ROUSSEL, INC.; ) | |
| WALGREEN CO.; and ) | |
| BOND DRUG COMPANY OF ) | |
| ILLINOIS D/B/A WALGREEN CO., ) | |
| a corporation, ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT

I, JOSEPH A. POWER, JR., upon oath, deposes and states the following:

1.    That I am one of the attorneys for the plaintiff, MAUREEN TOOMEY, in the above-entitled

cause of action.

2.    That upon information and belief, the money damages in this cause of action will exceed

$50,000.00.

POWER ROGERS & SMITH, P.C.

By _____

Joseph A. Power, Jr.

SUBSCRIBED AND SWORN TO
before me this _____ day
of _____, 2007.

_____
Notary Public
POWER ROGERS & SMITH, P.C.
70 W. Madison St., 55th Fl.
Chicago, IL 60602
312/236-9381
FAX: 312/236-0920

OFFICIAL SEAL
CAROLYN J BARTOLOTTA
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/08/10

Case 1:07-cv-07173    Document 11-2    Filed 01/25/2008    Page 8 of 45
12/20/2007 15:31 FAX 3123720522    JOHNSON & BELL    002/025
Case 1:07-cv-07173    Document 1    Filed 12/21/2007    Page 23 of 46

Firm No. 06347                3059-07054                JAC/MCH/AED

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

MAUREEN TOOMEY,                          )
                                         )
        Plaintiff,                       )
                                         )
vs.                                      )        No. 07 L 008736
                                         )
SANOFI-AVENTIS U.S. INC,                 )
F/K/A AVENTIS PHARMACEUTICALS, INC.,     )
F/K/A HOECHST MARION ROUSSEL, INC.;      )
WALGREEN CO.; and BOND DRUG              )
COMPANY OF ILLINOIS D/B/A WALGREEN       )
CO., a corporation                       )
                                         )
        Defendants.                      )

FILED-2
2007 SEP 26 PM 2:46
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION

## APPEARANCE AND JURY DEMAND

The undersigned, as attorney, enters the appearance of the defendant, BOND DRUG

COMPANY OF ILLINOIS, L.L.C. D/B/A WALGREENS, incorrectly sued as WALGREEN

CO. and BOND DRUG COMPANY OF ILLINOIS D/B/A WALGREEN CO., and WALGREEN

CO.

Defendant demands trial by jury.

_____
One of the attorneys for defendant, Bond Drug Company
of Illinois, LLC, d/b/a Walgreens, incorrectly sued as
Walgreen Co, and Bond Drug Company of Illinois d/b/a
Walgreen Co., and Walgreen Co.

John A. Childers, Esq.
Michael C. Holy, Esq.
Anthony E. Derwinski, Esq.
JOHNSON & BELL, LTD.
33 West Monroe St., Suite 2700
Chicago, Illinois 60603
(312) 372-0770

    I certify that a copy of the within instrument was served on all parties who have appeared
and have not heretofore been found by the Court to be in default for failure to plead.

_____
Attorney for Defendant

Exhibit C

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Firm No. 06347                3059-07077                JAC/MCH/AED

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION



MAUREEN TOOMEY,                          )
        Plaintiff,                     )
                                 )
vs.                                      )     No. 07 L 008730
                                 )
SANOFI-AVENTIS U.S. INC,                 )
F/K/A AVENTIS PHARMACEUTICALS, INC.,     )
F/K/A HOECHST MARION ROUSSEL, INC.;      )
WALGREEN CO.; and BOND DRUG              )
COMPANY OF ILLINOIS D/B/A WALGREEN       )
CO., a corporation                       )
        Defendants.                    )

## BOND DRUG AND WALGREEN CO.'S COMBINED MOTION TO DISMISS

NOW COME the Defendants, BOND DRUG COMPANY OF ILLINOIS, L.L.C. d/b/a WALGREENS, incorrectly sued as WALGREEN CO. and BOND DRUG COMPANY OF ILLINOIS d/b/a WALGREEN CO. (hereinafter "Bond Drug"), and WALGREEN CO., by and through their attorneys, JOHNSON & BELL, LTD., and for their motion to dismiss Plaintiff's Complaint at Law pursuant to 735 ILCS 5/2-615, 735 ILCS 5/2-619, 735 ILCS 5/2-619.1, 735 ILCS 5/2-622, and 735 ILCS 5/2-621, states as follows:

### FACTUAL BACKGROUND

On August 17, 2007, Plaintiff filed a Complaint at Law alleging in a single count that a prescription medication called Ketek which was manufactured by co-defendant Sanofi-Aventis entities was defective because there were no warnings that Keteck allegedly caused jaundice, chronic pain, hepatitis, carpal tunnel syndrome, and should not



be used for sinusitis. *See* Complaint at Law attached hereto as Exhibit A at para. 25-27, 29. Plaintiff further alleges that drug manufacturer co-defendant Sanofi-Aventis "knew the drug Ketek caused adverse reactions including hepatitis, jaundice, chronic pain, as well as carpal tunnel syndrome, and is only to be used in mild to moderate cases of community-acquired pneumonia". *Id.* at para. 22. Plaintiff, however, fails to allege anywhere in the complaint that these Defendants, Walgreen Co. and Bond Drug knew of the above allegations. In fact, Plaintiff candidly admits in her Complaint that prior to the relevant time alleged [August 24, 2005], there was "no warning in the Physicians' Desk Reference on the package insert for the drug commonly referred to as Ketek regarding adverse reactions including hepatitis, jaundice, chronic pain, as well as carpal tunnel syndrome, and should not be used for sinusitis". *Id.* at para. 24. Plaintiff further admits that prior to the relevant time alleged "there were no warnings to physicians and consumers including the plaintiff from SANOFI-AVENTIS about Ketek causing adverse reactions including hepatitis, jaundice, chronic pain, as well as carpal tunnel syndrome, and should not be used for sinusitis". *Id.* at para. 25.

Based on the allegations in the Complaint, there is an utter failure to connect any action or inaction on the part of these pharmacy defendants to any alleged breach of duty, causation and damages. Significantly, Plaintiff does not allege that these pharmacy Defendants mis-filled the subject 400 mg Ketek medication prescribed by Dr. Kimberly Ricuarte such as providing the wrong medicine, or the wrong dosage, or the wrong instructions. *See* Ex. A at para. 3-5

Here, the subject prescription medication was manufactured by the ANOFI-AVENTIS entities, named defendants in this lawsuit. *See* Affidavit of William Groth

2

attached hereto as Exhibit "B". Walgreen Co. and Bond Drug exercised no control over the design and manufacture of the subject Ketek prescription drug, nor did these defendants provide instructions or warnings to the manufacturer of said drug. *See* Ex. B. At no time did these pharmacy defendants possess any knowledge or information regarding any defect in the subject Ketek prescription drug which might or could cause injury or damage to Plaintiff. *Id.* These Defendants made no changes to the Ketek prescription drug which might or could have caused injury or damage to Plaintiff. *Id.* These pharmacy defendants are further not aware of any facts or circumstances upon which a verdict might be reached against them, other than with regarding to their status as a seller in the stream of commerce. *Id.* Simply put, these pharmacy Defendants were simply a seller in the stream of commerce with respect to the subject medication sold to Plaintiff. *Id.*

## SUMMARY OF ARGUMENT

Plaintiff's single Count Complaint against these pharmacy Defendants should be dismissed in accordance with the Illinois distributor statute pursuant to 735 ILCS 5/2-621.

Further, Plaintiff's single Count Complaint is based upon pharmacy malpractice which is a "healing art" under 735 ILCS 5/2-622. Plaintiff has failed to comply with section 2-622 of the Illinois Code of Civil Procedure in that the Complaint fails to attach a suitable health professional report to the Complaint, along with an attorney's affidavit pursuant to 735 ILCS 5/2-622(a)(1). As such, Plaintiff's Complaint at Law must be dismissed pursuant to 735 ILCS 5/2-619 and 735 ILCS 5/2-622(g).

3

Finally, Plaintiff's Complaint at Law should be dismissed pursuant to 735 ILCS 5/2-615 of the Illinois Code of Civil procedure as it fails to contain necessary factual allegations to maintain a professional "healing art" cause of action against these pharmacy defendants. Here, Plaintiff fails to identify the precise warnings this Defendant "voluntarily undertook" to give the decedent and further fails to identify the precise warnings that should have been given by these pharmacy defendants on April 24, 2005 that would be necessary under the pharmacy practice standard of care. This is particularly true where Plaintiff's own allegations admit that the drug manufacture SANOFI-AVENTIS knew of certain adverse reactions and restrictions on the use of the drug, but did not communicate those restrictions to the general public or even to physicians in the Physicians Desk Reference or package insert. *See* Ex. A at para. 22-26.

It is well settled in Illinois that the extent of a pharmacist's duty to warn is limited to the extent of the undertaking. Frye v. Medicare-Glaser Corp., 153 Ill.2d 26, 605 N.E.2d 557 (1992). In Frye, the Illinois Supreme Court held that "[i]n our opinion, consumers should principally look to their prescribing physician to convey the appropriate warnings regarding drugs, and it is the prescribing physician's duty to convey these warnings to patients". Frye, 153 Ill.2d at 34, 605 N.E.2d at 561. Here, Plaintiff fails to allege sufficient facts to establish what this Defendant's supposed undertaking was with respect to the prescription drug Ketek, and specifically how the alleged unspecified warnings were inaccurate given the lack of information available to pharmacists on or before August 24, 2005. Without specific factual allegations giving rise to a cognizable cause of action, this defendant cannot defend the lawsuit.

4

## ARGUMENT

**I.    PLAINTIFF'S SINGLE COUNT COMPLAINT SHOULD BE DISMISSED PURSUANT TO 735 ILCS 5/2-621.**

Plaintiff's single count complaint against these pharmacy defendants are based on a tort theory of liability. Section 735 ILCS 5/2-621 of the Illinois Code of Civil Procedure provides, in relevant part, the following:

> In any product liability action based on any theory or doctrine commenced or maintained against a defendant or defendants other than the manufacturer, that party shall upon answering or otherwise pleading, file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing injury, death or damage . . . This section applies to all causes of action occurring on or after September 24, 1979.

In this case, plaintiff is aware of the manufacturer of the drug at issue, SANOFI-AVENTIS since said manufacturer is already named a defendant in this lawsuit. Further William Groth, a Divisional Merchandise Manager for Pharmaceutical buying for Walgreen Co. confirms the above manufacturer. *See* Affidavit of Groth as Ex. B. Accordingly, these pharmacy Defendants are entitled to dismissal of the plaintiff's single Count Complaint at Law in accordance with 735 ILCS 5/2-621 of the Illinois Code of Civil Procedure.

Plaintiff does not assert any of the exceptions to the statute which are found within section 2-621(c) against these pharmacy defendants. *See* Ex. B. The statute provides only three exceptions, which, if applicable, prevent the dismissal of a distributor who certifies the identity of the manufacturer of a product. Section 735 ILCS 5/2-621(c) provides: a Court shall not enter a dismissal order relative to any certifying defendant or defendants other than the manufacturer even though full compliance with subsection (a) of this section has been made where the Plaintiff can show one or more of the following:

5

a.    That the Defendant has exercised some significant control of the design or manufacture of the product or has provided instructions or warnings to the manufacturer relative to the alleged defect in the product with which caused the injury, death or damage;  or

b.    That the Defendant had actual knowledge of the defect in the product which caused the injury, death or damage; or

c.    That the Defendant created the defect in the product which caused the injury, death or damage.

Here, these pharmacy Defendants exercised no control over the design and manufacture of the subject Ketek prescription medication, nor did these pharmacy Defendants provide instructions or warnings to the manufacturer of said drug. *See* Ex. B. At no time did these pharmacy defendants possess any knowledge or information regarding any defect in the subject Ketek prescription medication which might or could cause injury or damage to Plaintiff. *Id.* These pharmacy defendants acted simply as a seller in the stream of commerce with respect to the subject medication sold for Plaintiff. *Id.* Further, the alleged defect was not created by this defendant, and this Defendant had no knowledge, actual or otherwise, of an alleged defect that had the potential to cause injury or death to Plaintiff. *See* Ex. B.

Plaintiff has not even allege actual knowledge on the part of these pharmacy defendants of the alleged defect in the warnings or restrictions of use in the subject Ketek prescription drug, probably due to the fact that such information was not communicated to physicians, the public or anyone else via the package insert or PDR as of the August 24, 2005 according to Plaintiff's own Complaint. *See* Ex. A, at para. 22-26, 29.  A cause of action will be dismissed if it contains mere conclusions unsupported by facts. Harris v. Johnson, 218 Ill.App.3d 588, 578 N.E.2d 1326 (2d Dist. 1991).

6

In this case, the claim against these pharmacy defendants boils down to professional healing art-care services provided by the dispensing pharmacist. It is well settled that claims for strict liability must involve a claim premised upon an unreasonably dangerous product, rather than a claim premised on negligent services of a healing art professional, before liability may be imposed. Dubin v. Michael Reese Hospital & Medical Center, 83 Ill.2d 277, 415 N.E.2d 350 (1980). In Kirk, the Illinois Supreme Court referenced Dubin in stating with approval in holding that "a hospital cannot be held strictly liable for its employees' decision to administer x-ray treatments for tonsillitis because such an allegation is directed at the conduct of the health care professional rather than the nature of the particular product." Kirk v. Michael Reese Hospital and Medical Center, 117 Ill.2d 507, 522, 513 N.E.2d 387, 394 (1987). Similar to Kirk and Dubin, Plaintiff seeks to improperly hold these pharmacy Defendants strictly liability for the conduct of its pharmacist. Here, Plaintiff alleges that these pharmacy defendants should have affirmatively provided different warnings and restrictions of use of the drug than that provided by the manufacturer. In essence, Plaintiff seeks to impose strict liability on these pharmacy Defendants for the actions of its pharmacist in purportedly failing to give additional or different warnings than that given by the prescribing non-defendant physician, or the defendant drug manufacturer.



Illinois courts have addressed the issue of strict liability claims relating to pharmacists. See Leesley v. West, 165 Ill.App.3d 135, 518 N.E.2d 758 (2d Dist. 1988). The plaintiff in Leesley brought an action against a physician, pharmacy and drug manufacturer for damages resulting from severe gastrointestinal bleeding caused by a prescription drug. The Leesley court first addressed the question of strict liability of the

7

pharmacist and held that the pharmacist could not be found liable under a strict liability theory. Id. In limiting the liability of pharmacy retailers, Courts have held that pharmacy retailers should be permitted to rely on the special expertise of drug manufacturers, prescribing physicians and regulatory agencies. *See* Loesley v. West, 165 Ill.App.3d 135, 518 N.E.2d 758 (2d Dist. 1988).

Since none of the statutory exceptions provided in the distributor's statute have been shown to apply in this case, Plaintiff's single Count Complaint against Bond Drug and Walgreen Co. should be dismissed with prejudice as a matter of law pursuant to 735 ILCS 5/2-619 and 735 ILCS 5/2-621.

## II.  PLAINTIFF'S SINGLE COUNT COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE AS IT FAILS TO COMPLY WITH 735 ILCS 5/2-622.

Illinois courts have addressed section 2-622 of the Illinois Code of Civil Procedure by explaining what "healing art malpractice" means. The term "healing art malpractice" is broad in its scope and should not be limited in its application to health care professionals. Lyon v. Hasbro Industries, 156 Ill.App.3d 649, 509 N.E.2d 702, 706 (4th Dist. 1987). In Lyon, the plaintiff sued an ambulance transport company for its failure to adequately equip its vehicles to handle foreseeable emergencies. The court carefully examined the meaning of "healing art malpractice" in both the scope of the phrase and its statutory meaning. In examining the allegation that the ambulance company failed to properly equip its vehicles, the Lyon Court found that "the term 'healing art malpractice' is broad in scope," and can include negligence by a licensed health-care practitioner dealing with the "restoration of physical and mental health." *See* Lyon, 156 Ill.App.3d at 653-54 (emphasis added). In fact, the Court held that "the phrase

may be interpreted broad enough to cover negligence in interrelated health-care services."

Lyon, 156 Ill.App.3d at 654.

Specifically, in Lyon, the Court held as follows:

> "...the term "healing art malpractice" is broad... The Bernier court stated that the statutory language may include health professionals other than medical doctors. However, it did not limit the application of the healing art provisions to health professionals. The statute specifically includes hospitals in the coverage of its provisions. A hospital is not a health-care professional, although it provides related health-care services. It is also licensed and regulated by the State. Therefore, under principles of statutory construction, 'healing art' could include negligence by a licensed health-care service and need not be limited to a licensed professional practitioner...Malpractice implies the lack of skill in practicing the art or profession. Thus, the phrase may be interpreted as broad enough to cover negligence in the interrelated health-care services." Lyon, 156 Ill.App.3d 649, 654, 509 N.E.2d 702 (4th Dist. 1987); and cited Bernier v. Burris, 113 Ill.2d 219, 497 N.E.2d 763 (1986). (emphasis added).

In a recent case, the First District Appellate Court continues to affirm the notion of broad application to the term "healing art malpractice" since the Court applied the term "healing art malpractice" and section 2-622 to licensed occupational therapists. Jackson v. Chicago Classic Janitorial and Cleaning Service, Inc., 355 Ill.App.3d 906, 823 N.E. 2d 1055(1st Dist. 2005) (application of section 2-622 to occupational/physical therapists even though that category of healing art practitioner is not specifically referenced in the statute).

Moreover, the Northern District of Illinois recently affirmed, under Illinois law, that a pharmacy "may avail itself of the protection of the HAMA (Healing Arts Malpractice Act). Plaintiffs' negligence claim at least, is subject to the limitations of section 2-1115". Happel v. Wal-Mart Stores, Inc., 286 F.Supp.2d 943 (N.D.Ill. 2003). The language contained in section 2-1115 and section 2-622 of the Illinois Code of Civil Procedure are identical in that the statutory sections apply to all actions, whether tort,

9

contract, or otherwise, in which Plaintiff seeks damages for injury or death by reason of "medical, hospital or other healing art malpractice". *See* 735 ILCS 5/2-622 *compare with* 735 ILCS 5/2-1115. In reaching its holding, the Happel Court relied upon Lyon v. Hasbro Industries, Inc., 156 Ill.App.3d 649, 654, 509 N.E.2d 702, 706 (4th Dist. 1987).

In Illinois, pharmacy licensing is governed by state statute, like all other healing-arts practitioners. See 225 ILCS 85/1, *et seq.*; See also 225 ILCS 85/5.5. Walgreen Co. pharmacists, like all Illinois pharmacists, must go through accredited scientific training, and then must pass a rigorous examination battery to be licensed through the state board. See 225 ILCS 85/6 (licensing requirements set out by statute, including completion of an accredited degree program, passing a Board licensing examination). More than that, however, the services rendered by registered pharmacists are based upon a professional standard of care, and are premised upon services to restore the mental and physical health of patients. *See* 225 ILCS 85/1, *See also* Eldridge v. Eli Lilly & Co., et al., 138 Ill.App.3d 124, 485 N.E.2d 551 (4th Dist. 1985).

Here, Plaintiff is not claiming that the patient received from these pharmacy defendants the wrong drug or different instructions than those given by the prescribing physician. Rather, Plaintiff is alleging that this pharmacy defendant had an affirmative duty to warn or prevent distribution of an allegedly defective prescription medication manufactured by Defendant SANOFI-AVENTIS. Here, Plaintiff alleges that these pharmacy defendants should have affirmatively provided different or additional warnings and restrictions of use of the drug than that given by the non-defendant prescribing physician or the defendant drug manufacturer. As such, Plaintiff's allegations against Walgreen Co. necessarily fall within the ambit of 735 ILCS 5/2-622, and in light of

10

Plaintiff's failure to comply, this Defendant respectfully requests that Plaintiff's single Count Complaint against Bond Drug and Walgreen Co. be dismissed with prejudice pursuant to 735 ILCS 5-622(g) and 735 ILCS 5/2-619. *See* Cothren v. Thompson, M.D., 356 Ill.App.3d 279, 826 N.E.2d 534 (4th Dist. 2005); Calamari v. Drammis, 286 Ill.App.3d 420, 676 N.E.2d 281 (1st Dist. 1997).

III.    **PLAINTIFF'S SINGLE COUNT COMPLAINT SHOULD BE DISMISSED PURSUANT TO 735 ILCS 5/2-615 OF THE ILLINOIS CODE OF CIVIL PROCEDURE AS IT FAILS TO CONTAIN NECESSARY ALLEGATIONS TO MAINTAIN A COGNIZABLE CAUSE OF ACTION AGAINST THESE PHARMACY DEFENDANTS.**

It is well settled in Illinois that a section 2-615 motion to dismiss addresses defects on the face of the pleading, admitting all well-pleaded facts and attacking facially the complaint's legal sufficiency. Aguilar v. Safeway Ins. Co., 221 Ill.App.3d 1095, 582 N.E.2d 1362 (1st Dist. 1991). While the pleadings should be liberally construed, liberal construction cannot supply fatal deficiencies, such as necessary factual allegations. Kirby v. Chicago City Bank and Trust Co., 82 Ill.App.3d 1113, 403 N.E.2d 720 (1980).

Plaintiff must establish that there is a reasonable certainty that the defendant's negligent acts caused the injury. Schultz v. Hennessy Industries, Inc., 222 Ill.App.3d 532, 584 N.E.2d 235 (1st Dist.1991) (emphasis added). Liability cannot be premised on speculation, guess or conjecture as to the cause of the injury. Potter v. Edgar, 34 Ill.App.3d 33, 339 N.E.2d 321 (1975).

Here, Plaintiff fails to assert necessary factual allegations to maintain a professional "healing art malpractice" cognizable cause of action against these pharmacy Defendants. Here, Plaintiff fails to identify the precise warnings that should have been

11

given by these pharmacy defendants to the plaintiff that would be necessary under the pharmacy practice standard of care, that was available to and known by these pharmacy defendant on or before August 24, 2005, that caused or contributed to the Plaintiff's injury or damage.   Plaintiff's own allegations admit that the drug manufacture SANOFI-AVENTIS knew of certain adverse reactions and restrictions on the use of the drug, but did not communicate those restrictions to the general public or even to physicians in the Physicians Desk Reference or package insert. *See* Ex. A at para. 22-26. Plaintiff has not, and most assuredly is unlikely to, allege that pharmacists somehow had knowledge that was not communicated to the general public or physicians by the drug manufacturer. Without specifying what information and warnings these pharmacy defendants "voluntarily undertook" to provide to Plaintiff, Plaintiff summarily jumps to the conclusion that these pharmacy defendants failed to properly warn Plaintiff on August 24, 2005 of an unspecified warning about the side effects of Ketek, including jaundice, chronic pain, hepatitis, carpal tunnel syndrome and that the drug is only to be used for mild to moderately severe cases of community-acquired pneumonia. See Ex. A at para 28-30.

In Frye, a pharmacist affixed to a prescription vial a label warning that the medicine might cause drowsiness, Frye v. Medicare-Glaser Corp., 153 Ill.2d 26, 29, 605 N.E.2d 557, 558 (1992). The plaintiff sued the pharmacist and pharmacy under a voluntary undertaking theory, arguing that once the pharmacist undertook to warn of dangerous side effects, he undertook to warn of all potential dangers involved in taking the drug. Frye, 153 Ill.2d at 28, 605 N.E.2d at 558. The Illinois Supreme Court rejected plaintiff's argument and found that the defendants' liability depended upon the extent of

the undertaking. Frye, 153 Ill.2d at 34-35; 605 N.E.2d at 561. The Frye Court further rejected the argument that the warning provided would mislead a patient and specifically noted that *"[i]n our opinion, consumers should principally look to their prescribing physician to convey the appropriate warnings regarding drugs, and it is the prescribing physician's duty to convey these warnings to patients"*. Frye, 153 Ill.2d at 34, 605 N.E.2d at 561 (emphasis added).

*[handwritten margin note: Duty to Warn]*

In Kasin, the appellate court addressed a patient information sheet provided by Osco to a patient involving the drug Daypro and held that the limited warnings did not invoke a greater duty to warn. The Kasin plaintiff did not assert that the warnings provided were inaccurate; rather, the Plaintiff argued that Osco failed to warn of other side effects, such as possible renal failure or injury to kidneys. Kasin, 312 Ill.App.3d at 824, 728 N.E.2d at 77-78. Like the warning in Frye, the Court in Kasin concluded that the written warnings constituted the extent of the pharmacist's undertaking to warn the Plaintiff, and that the warnings need only be accurate. Kasin, 312 Ill.App.3d at 829, 728 N.E.2d at 81.

In this case, Plaintiff fails to allege sufficient facts to establish what these pharmacy Defendant's supposed "voluntary undertaking" was with respect to warnings relative to the Ketek prescription drug, and specifically how the unspecified warnings were inaccurate given the utter lack of information available to pharmacists, physicians and the general public on and before August 24, 2005. *See* Ex. A, including para. 22-26.

Here, plaintiff's allegations are insufficient as a matter of law. Without specific factual allegations giving rise to a cognizable cause of action, these defendants cannot defend the lawsuit. Accordingly, Plaintiff's single Count Complaint against Bond

13

Drug and Walgreen Co. must be dismissed with prejudice pursuant to 735 ILCS 5/2-615 of the Illinois Code of Civil Procedure.

WHEREFORE, Defendants, Bond Drug Company of Illinois, LLC, d/b/a Walgreens, incorrectly sued as Walgreen Co. and Bond Drug Company of Illinois d/b/a Walgreen Co., and Walgreen Co., respectfully requests that Plaintiff's Complaint be dismissed in accordance with the motion set forth herein, and for any further relief this Court deems fair and just.

Respectfully submitted,

JOHNSON & BELL, LTD.

One of the attorneys for defendant, Bond Drug Company of Illinois, LLC, d/b/a Walgreens, incorrectly sued as Walgreen Co. and Bond Drug Company of Illinois d/b/a Walgreen Co., and Walgreen Co.

John A. Childers, Esq.
Michael C. Holy, Esq.
Anthony E. Derwinski, Esq.
JOHNSON & BELL, LTD.
33 West Monroe St., Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Firm I.D. No. 06347

14

Case 1:07-cv-07173   Document 11-2   Filed 01/25/2008   Page 23 of 45
12/20/2007 16:36 FAX  3123720522      JOHNSON & BELL                    ☐024/025
Case 1:07-cv-07173   Document 1   Filed 12/21/2007   Page 45 of 46

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

MAUREEN TOOMEY,                          )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )          2007L003730
                                         )
SANOFI-AVENTIS U.S. INC. F/K/A AVENTIS   )
PHARMACEUTICALS INC., F/K/A              )
SANOFI-AVENTIS MARION ROUSSEL,           )
INC.; WALGREEN CO.; and BOND DRUG        )
COMPANY OF ILLINOIS D/B/A                )
WALGREEN CO., a corporation              )
                                         )
              Defendants.                )

## AFFIDAVIT OF WILLIAM GROTH

William Groth, being sworn, states:

1.   My name is William Groth.

2.   I have served as Divisional Merchandise Manager for Pharmaceutical Buying for Walgreen Co., an Illinois Corporation, during the period of 1999 to the present.

3.   In that capacity, I have personal knowledge of the statements contained in this affidavit. I am fully familiar with all name brand products currently and in the past sold by Walgreen Co.

4.   I am competent to make this Affidavit.

5.   I am over the age of twenty-one (21) years old.

6.   That Walgreen Co. is a Defendant in the above-captioned matter.

7.   The prescription drug Ketek® was manufactured by Co-Defendant, Sanofi-Aventis U.S. Inc., to this action.

8.   Walgreen Co. exercised no control over the design and manufacture of Ketek®, nor did Walgreen Co. provide instructions or warnings to the manufacturer of said drug.

10. At all times relevant to this litigation, Walgreen Co., possessed no knowledge or information regarding any defect in Ketek® which might or could have caused injury or damage to Plaintiff.

11. Walgreen Co. made no changes in Ketek® which might or could have caused injury or damage to Plaintiff.

12. Walgreen Co. is not aware of any facts or circumstances upon which a verdict might be reached against it, other than with regard to its status as a seller in the stream of commerce of Ketek®.

13. Further Affiant Sayeth Not.

Under penalties as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

_William E. Groth Jr._
William Groth

Subscribed and Sworn to before me this _18th_ day of _September_, 2007.

_Mayra Vazquez_
Notary Public

My Commission Expires:
_8-8-10_

OFFICIAL SEAL
MAYRA VAZQUEZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXP. AUG 08 2010

2

MAGISTRATE JUDGE ASHMAN

JUDGE MANNING

000000.53

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**RECEIVED**

DEC 21 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAUREEN TOOMEY,

      Plaintiff,

  v.

SANOFI-AVENTIS U.S. INC.
f/k/a AVENTIS PHARMACEUTICALS
INC., f/k/a HOECHST MARION
ROUSSELL, INC.; WALGREEN CO.;
and BOND DRUG COMPANY OF
ILLINOIS d/b/a WALGREEN CO.,
a corporation,

      Defendants

No.

(Removed from the Circuit Court of Cook
County, Illinois, Case No. 07 L 8730)

# 07C 7173

## NOTICE OF REMOVAL

1. This is a civil action within the meaning of the Acts of Congress relating to removal of cases. See 28 U.S.C. § 1441(b) and 1446(b).

2. Plaintiff Maureen Toomey ("Plaintiff") filed this civil action, case number 07 L 008730, in the Circuit Court of Cook County, Illinois, on August 17, 2007, against sanofi-aventis. Plaintiff also named as co-defendants Walgreen Co. and Bond Drug Company of Illinois, L.L.C. d/b/a Walgreens (collectively "Walgreens"). A copy of the notice of removal filed with the Circuit Court of Cook County is attached hereto as Exhibit "A."

3. Sanofi-aventis removes this action to the United States District Court for the Northern District of Illinois, Eastern Division, which is the judicial district and division in which the action is currently pending.



4.    Plaintiff alleges in her Complaint at Law ("Complaint") that she suffered injury as a result of her ingestion of the prescription antibiotic telithromycin, also known as Ketek®. (Complaint ¶ 29-30). Pursuant to 28 U.S.C. § 1446(a), copies of all process and pleadings served on sanofi-aventis in this action, including the Complaint, are attached as Exhibit "B."

5.    Removal is timely pursuant to 28 U.S.C. § 1446(b). Sanofi-aventis was served with a copy of Plaintiff's Complaint on November 27, 2007, through its registered agent, Corporation Service Company. Less than thirty days have passed since sanofi-aventis was served, and this Notice of Removal is filed within one year of the commencement of this action. See FED. R. CIV. P. 6.

6.    Because Walgreens is not a properly joined defendant in this action, sanofi-aventis may remove this action without Walgreens joining in the removal. See, e.g., Jernigan v. Ashland Oil Co., 989 F.2d 812, 815 (5th Cir. 1993) ("[I]n cases involving alleged improper or fraudulent joinder of parties, however, application of [the consent] requirement to improperly or fraudulently joined parties would be nonsensical, as removal in those cases is based on the contention that no other proper defendant exists."). In addition, although Walgreens was served with a copy of Plaintiff's Complaint more than thirty days prior to the date of this Notice of Removal, because Walgreens was fraudulently joined, the time in which the case may be removed does not run from the date of service upon Walgreens. See Eaglestar Intertrade Ltd. v. Dafen Asset Finance Ltd., 2006 U.S. Dist. LEXIS 86176 (E.D. Wis. Nov. 27, 2006); Hodges v. The Hartford Ins. Co., 2006 U.S. Dist. LEXIS 47361 (N.D. Miss. July 11, 2006).

7.    This Court has original diversity subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the properly joined

- 2 -

parties, no properly joined defendant is a citizen or resident of Illinois, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs.

## I.    COMPLETE DIVERSITY OF CITIZENSHIP EXISTS BETWEEN PLAINTIFF AND SANOFI-AVENTIS.

8.    Sanofi-aventis is, and was at the time of the institution of this case, a Delaware corporation that maintains its principal place of business in New Jersey.  Sanofi-aventis is not a citizen or resident of Illinois.

9.    Plaintiff did not plead her own citizenship in her Complaint.

10.    Upon information and belief, Plaintiff is, and was at all times relevant to her Complaint, a citizen of Illinois.  Plaintiff does not allege in her Complaint that she is, or was at any time relevant to the Complaint, a citizen or resident of any state other than Illinois.

11.    The facts alleged in Plaintiff's Complaint suggest that Plaintiff is not a citizen of either Delaware or New Jersey.  Plaintiff was allegedly prescribed Ketek® by an Illinois-licensed physician and filled that prescription at Walgreens in Evanston, Illinois.  (Complaint ¶¶ 3-5). Plaintiff allegedly was admitted to Evanston Hospital in Illinois on or about September 16, 2005; October 21, 2005; and December 12, 2005.  (Complaint ¶¶ 10-12, 15).  Plaintiff allegedly consulted with a neurologist at Evanston Hospital in Illinois in February 2006.  (Complaint ¶ 16). Plaintiff allegedly was treated by a doctor at Northwestern Memorial Hospital in Illinois in May 2006.  (Complaint ¶ 17).

12.    Accordingly, complete diversity of citizenship exists between the Plaintiff and sanofi-aventis.

- 3 -

13.    As explained infra, Plaintiff has fraudulently joined Walgreens to this action, and thus the Court should disregard Walgreens' citizenship when determining whether complete diversity of citizenship exists. See Schwartz v. State Farm Mut. Auto Ins. Co., 174 F.3d 875, 878 (7th Cir. 1999); Gottlieb v. Westin Hotel Co., 990 F.2d 323, 327 (7th Cir. 1993).

## II.    WALGREENS, THE ONLY NAMED DEFENDANT THAT IS A RESIDENT OF ILLINOIS, WAS FRAUDULENTLY JOINED.

14.    The doctrine of fraudulent joinder dictates that a defendant's citizenship is ignored for the purpose of diversity jurisdiction when "there is no possibility that a plaintiff can state a cause of action against [the] nondiverse defendant[]...." Gottlieb, supra.[1] A copy of Walgreens' motion to dismiss filed in the Circuit Court of Cook County is attached hereto as Exhibit "C."

15.    As this Court has held, a defendant is fraudulently joined when state law fails to impose upon that defendant any duty toward the plaintiff that could support recovery. See, e.g., Bergman v. U.S. Silica, 2006 U.S. Dist. LEXIS 76500, *18-22 (N.D. Ill. 2006) (holding that a trucking company was fraudulently joined in a products-liability action when applicable Illinois law did not impose any duty on providers of peripheral services, such as transportation, related to the product at issue); Sandage v. Cottrell, Inc., 2006 U.S. Dist. LEXIS 67419, *14-21 (holding that car dealership, financial lessor, and holding company were fraudulently joined in a products-liability action because Illinois law did not impose on them any duty to the plaintiff).

16.    With respect to pharmaceuticals, Illinois law provides that, absent special circumstances not alleged in Plaintiff's Complaint, a pharmacist has no duty to provide warnings

- 4 -

to a patient concerning appropriate dosages or adverse effects of a prescription drug. See

Fakhouri v. Taylor, 248 Ill. App. 3d 328 (1993) (holding that because of the learned-intermediary

doctrine, a pharmacist has no duty to warn that drugs are being prescribed in excessive

quantities); Leesley v. West, 165 Ill. App. 3d 135 (1988) (applying the learned-intermediary

doctrine and holding that that the defendant pharmacy had no duty to pass on to a customer

relevant warnings given to it by the manufacturer of a prescription drug because such duty

belonged solely to the physician).

17.    Plaintiff's claim against Walgreens is based solely on Plaintiff's contention that

"the manufacturer and distributor of prescription drugs had a duty to warn consumers such as

MAUREEN TOOMEY of the dangers and adverse reactions of those drugs as well as indications

for use." (Complaint ¶ 29) (emphasis added).

18.    Plaintiff's contention is incorrect as a matter of law.  Absent special

circumstances--which Plaintiff has not alleged--a pharmacy has no duty to warn an individual of

any potential side effect of or adverse reaction to a prescription drug. See Fakhouri and Leesley,

supra.  Plaintiff's Complaint, therefore does not state a cause of action against Walgreens, and

thus the doctrine of fraudulent joinder applies to Walgreens.  The Court should therefore

disregard Walgreens' citizenship in the removal analysis and hold that complete diversity of

citizenship exists in this action.

## III.    THE AMOUNT-IN-CONTROVERSY REQUIREMENT IS SATISFIED.

---

[1] In this context, the term "fraudulent" does not necessarily connote misrepresentation by the plaintiff but is instead a term of art that typically "involves a claim against an in-state defendant that simply has no chance of success whatever the plaintiff's motives." Poulos v. Naas Foods, Inc., 959 F.2d 69, 73 (7th Cir. 1992) (citing cases).

19.    The amount-in-controversy requirement is satisfied in this case. Plaintiff's
Complaint alleges that Plaintiff has been diagnosed with stones in her gallbladder, pancreatitis,
auto immune hepatitis, carpal tunnel syndrome and inflammatory poly arthritis. (Complaint ¶¶ 9,
11, 16, 17.) In addition, Plaintiff allegedly has been admitted to the hospital three times and has
undergone laparscopic surgery. (Complaint ¶ 10, 12, 15.). Plaintiff contends that she has been
"injured, has experienced pain and suffering; has been disabled and disfigured; has incurred
expenses for medical, prescription, therapy, and other similar expenses; and has lost wages."
(Complaint ¶ 30).

20.    Plaintiff seeks unlimited damages for her alleged injuries "in excess of FIFTY
THOUSAND DOLLARS ($50,000.00)." (Complaint page 6, ad damnum clause).

21.    In a case such as this one, where Plaintiff provides little information about the
value of her claims, "a good-faith estimate of the stakes is acceptable" to establish the amount in
controversy if that good-faith estimate is "plausible and supported by a preponderance of the
evidence." See, e.g, Rubel v. Pfizer, Inc., 361 F.3d 1016, 1020 (7th Cir. 2004).

22.    Here, a good-faith estimate reveals that the amount in controversy in this case
exceeds $75,000.00, exclusive of interests and costs. See Campbell v. Bayou Steel Corp., 338 F.
Supp. 2d 896 (N.D. Ill. 2004) (defendants were on notice that damages sought exceeded $75,000
where plaintiff alleged severe and permanent injuries and compensation for extensive medical
treatment); McCoy v. General Motors Corp., 226 F. Supp. 2d 939 (N.D. Ill. 2002) (complaint
obviously sought in excess of $75,000 in damages where plaintiff alleged lasting and permanent
injuries, medical, surgical and hospital bills, lost wages and lost profits); Andrews v. E.I. Du
Pont De Nemours & Co., 447 F.3d 510, 514-15 (7th Cir. 2006) (finding amount in controversy

- 6 -

satisfied in action removed from Illinois state court where plaintiff sought damages "in excess of $50,000" and alleged that he suffered "severe and permanent" injuries to his head, ribs, and back and also sought damages for pain and suffering, past and future lost wages, past and future medical expenses, and for disabilities suffered).

23.    Pursuant to these authorities, Plaintiff's allegations establish that the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

### IV.    SANOFI-AVENTIS HAS SATISFIED ALL OTHER REQUIREMENTS FOR REMOVAL.

24.    Sanofi-aventis has provided written notice of this removal to Plaintiff's counsel.

25.    Sanofi-Aventis will also promptly file a copy of this Notice of Removal in the Circuit Court of Cook County, Illinois. A copy of sanofi-aventis' Notice of Filing of Notice of Removal is attached as Exhibit "B."

26.    If any question arises concerning the propriety of this removal, sanofi-aventis respectfully requests an opportunity to present a brief, evidence, and oral argument to further establish that this case is properly removable.

WHEREFORE sanofi-aventis removes this case from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois, Eastern Division.

This 21st day of December, 2007.

Respectfully submitted,

DONOHUE BROWN MATHEWSON & SMYTH LLC

By: _____
Bryan J. Kirsch

- 7 -

DONOHUE BROWN MATHEWSON & SMYTH LLC
Donald J. Brown (ARDC #0312630)
John A. Krivicich (ARDC #3127319)
Bryan J. Kirsch (ARDC #6277793)
140 South Dearborn Street, Suite 800
Chicago, IL  60603
Telephone:    (312) 422-0900
Facsimile:    (312) 422-0909

Of Counsel:
N. Karen Deming
Georgia Bar No. 217581
TROUTMAN SANDERS LLP
Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Telephone:    (404) 885-3000
Facsimile:    (404) 885-3900

# In The Matter Of:

## MAUREEN TOOMEY v.
## SANOFI-AVENTIS U.S., INC.

RECEIVED

DEC 0 6 2007

POWER ROGERS & SMITH, P.C.

## WILLIAM GROTH
### November 27, 2007

## SULLIVAN REPORTING CO.
## TWO NORTH LA SALLE STREET
## SUITE 1780
## (312) 782 - 4705

Original File 112707bp dep.txt, Pages 1-33

**Word Index included with this Min-U-Script®**

**Page 1**

[1]  STATE OF ILLINOIS )
                        )  SS:
[2]  COUNTY OF COOK    )
[3]      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - LAW DIVISION
[4]
     MAUREEN TOOMEY,              )
[5]                               )
            Plaintiff,            )
[6]                               )
        vs.                       ) No. 07 L 008730
[7]                               )
     SANOFI-AVENTIS U.S., INC. F/K/A)
[8]  AVENTIS PHARMACEUTICALS, INC., )
     F/K/A HOECHST MARION ROUSSEL, )
[9]  INC., WALGREEN CO. And BOND   )
     DRUG COMPANY OF ILLINOIS D/B/A )
[10] WALGREEN CO., a corporation,  )
                                  )
[11]         Defendants.          )
[12]
[13]         The Discovery Deposition of WILLIAM GROTH,
[14] taken under oath on the 27th day of November 2007,
[15] at Suite 200, 104 Wilmot Street, Deerfield,
[16] Illinois, pursuant to the Rules of the Supreme
[17] Court of Illinois and the Code of Civil Procedure,
[18] before Barbara A. Perkovich, a notary public in and
[19] for the County of DuPage and State of Illinois,
[20] pursuant to notice.
[21]
[22]
[23]
[24]

**Page 3**

[1]               I N D E X
     WITNESS:                              PAGE
[2]
     WILLIAM GROTH
[3]
        Examination by:
[4]
        Mr. Power                          4
[5]
[6]
[7]
[8]
[9]           E X H I B I T S
     NUMBER                    FOR IDENTIFICATION
[10]        (None so marked.)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

**Page 2**

[1]  APPEARANCES:
[2]     POWER, ROGERS and SMITH
        MR. JOSEPH A. POWER, JR.
[3]     70 West Madison, Suite 5500
        Chicago, Illinois 60602
[4]        for the plaintiff;
[5]     JOHNSON & BELL
        MR. JOHN A. CHILDERS
[6]     33 West Monroe Street, Suite 2700
        Chicago, Illinois 60603-5404
[7]        for the defendants.
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

**Page 4**

[1]      (Witness sworn.)
[2]      WILLIAM GROTH,
[3] called as a witness herein, having been first duly
[4] sworn, was examined and testified as follows:
[5]      EXAMINATION
[6]      BY
[7]      MR. POWER:
[8]      Q.  Could you please state your full name for
[9] the record, sir?
[10]     A.  William Edwin Groth Senior.
[11]     Q.  Let the record reflect this is the
[12] discovery deposition of William Edwin Groth Senior,
[13] pursuant to notice, pursuant to the applicable
[14] Supreme Court rules, the Illinois Civil Practice
[15] Act and the Circuit Court Rules of Cook County.
[16]     Mr. Groth, I'm going to ask you a number
[17] of questions here today.  If there is anything I
[18] say to you you don't understand, please tell me and
[19] I'll try and clarify it, okay?
[20]     A.  Yes, sir.  Thank you.
[21]     Q.  The court reporter is recording verbatim
[22] everything that is said here.  She cannot record a
[23] nod of the head, so you must answer everything
[24] audibly, all right?

**Page 5**

[1]  A.  Yes, sir.

[2]  Q.  And what is your date of birth, sir?

[3]  A.  November 13th, 1951.

[4]  Q.  And where were you born?

[5]  A.  St. Louis, Missouri.

[6]  Q.  What high school did you attend?

[7]  A.  Canoga Park High School in Canoga Park,

[8]  California.

[9]  Q.  And what college?

[10]  A.  St. Louis College of Pharmacy in St. Louis,

[11]  Missouri.

[12]  Q.  And you graduated from there?

[13]  A.  Yes, sir.

[14]  Q.  And when was that?

[15]  A.  1980, I believe.

[16]  Q.  And what did you do after that?

[17]  A.  I went to work as a pharmacist in

[18]  Springfield, Missouri.

[19]  Q.  And how long did you hold that position?

[20]  A.  I believe I was there about 2 years.

[21]  Q.  What did you do after that?

[22]  A.  Moved back to St. Louis and worked for a

[23]  pharmacy, retail pharmacy, called Medicare Glazer

[24]  for about 6 months.

**Page 6**

[1]  Q.  What did you do after?

[2]  A.  Then went to work for Walgreens Company as

[3]  a pharmacist in the St. Louis area.

[4]  Q.  And how long did you do that?

[5]  A.  About 5 years.  And then was asked to be

[6]  the pharmacy supervisor for a group of stores in

[7]  St. Louis, Missouri, overseeing the management of

[8]  the pharmacy departments in St. Louis stores.

[9]  Q.  And how long did you do that?

[10]  A.  Again, about 5 years.

[11]  Q.  And what did you do after that?

[12]  A.  I was asked to transfer here to Chicago to

[13]  work at the Walgreens corporate office in the RX

[14]  purchasing department.

[15]  Q.  And what was your first position there?

[16]  A.  The title was replenishment buyer, which

[17]  entailed simply ordering products into our

[18]  distribution centers.

[19]  Q.  And any other duties and responsibilities

[20]  other than that?

[21]  A.  Not at that time.

[22]  Q.  And then what was your next position, if

[23]  any?

[24]  A.  I moved out of the RX division into the OTC

**Page 7**

[1]  division as an assistant category manager for about

[2]  a year and then a category manager, overseeing the

[3]  purchasing of vitamins and diagnostic supplies for

[4]  the Walgreens Company.

[5]  Q.  And how long did you do that for?

[6]  A.  That was probably, now I'm guessing, about

[7]  three years or so and then —

[8]  Q.  What did you do after that?

[9]  A.  And then I moved to and became the

[10]  divisional manager for RX purchasing and moved back

[11]  into the RX division.

[12]  Q.  And is that your current position?

[13]  A.  That is my current position, yes.

[14]  Q.  And what are your duties and

[15]  responsibilities in that position?

[16]  A.  I have category managers both on the

[17]  branded side of the business and the generic side

[18]  of the business that report in to me on all the

[19]  purchases that we make into our distribution

[20]  centers for branded pharmaceuticals and generic

[21]  pharmaceuticals, as well as responsibility for

[22]  contracts with the wholesalers that we do business

[23]  with.

[24]  Q.  And what is your area, obviously Illinois

**Page 8**

[1]  is included in your area, are you in charge of the

[2]  midwest or the entire country or what?

[3]  A.  The entire country.

[4]  Q.  And in respect to adverse reaction

[5]  complaints and things of that nature, would that

[6]  come to you?

[7]  A.  Typically they would go straight to the

[8]  category manager.

[9]  Q.  And who from 2005 to present was the

[10]  category manager for Walgreens?

[11]  A.  In 2005 the category manager was Sheila

[12]  Bennett on the branded side of the business.  She

[13]  has since retired and as of July replaced by a

[14]  young lady name Usra Bahlim (phonetic).

[15]  Q.  And where is Sheila Bennett from?

[16]  A.  I believe she's located in Chicago.

[17]  Q.  And when you say the branded side of the

[18]  business, would that include the drug at issue here

[19]  the Ketek?

[20]  A.  Yes, sir.

[21]  Q.  And what is the difference between the

[22]  branded and the generic sides?

[23]  A.  Branded side are the product that are

[24]  manufactured by companies such as Sanofi America,

**Page 9**

[1] that are single source branded, name brand
[2] products. The generic side of the business is when
[3] those patents are over with and generic
[4] manufacturers begin making the same product under
[5] ANDA's that they file with the FDA.
[6]   **Q.** Sanofi, they only make the branded side of
[7] the business?
[8]   **A.** I can't answer that, I do not know if they
[9] have any generic manufacturers. I'm not aware of
[10] any, no.
[11]   **Q.** Now, in respect to the drug Ketek, do you
[12] know when it was first manufactured?
[13]   **A.** I believe it was launched and had FDA
[14] approval early in 2004.
[15]   **Q.** And when did Walgreens begin purchasing
[16] that particular prescription drug?
[17]   **A.** Shortly thereafter, early in 2004.
[18]   **Q.** And do you know for what ailments it was
[19] prescribed?
[20]   **A.** It was an antibiotic.
[21]   **Q.** For what problems?
[22]   **A.** I believe — I don't know all the details,
[23] but I believe it was specifically for different
[24] types of pneumonia.

**Page 10**

[1]   **Q.** Was it also prescribed for minor sinus
[2] infections?
[3]   **A.** I don't know that answer, sir.
[4]   **Q.** When is the last time you filled a
[5] prescription?
[6]   **A.** Probably 15 years ago.
[7]   **Q.** Did you ever deal with any of the
[8] manufacturer's reps regarding this drug, the Ketek
[9] drug?
[10]   **A.** I have dealt with the manufacturer's reps,
[11] yes, in the past.
[12]   **Q.** And back when this product was first being
[13] sold, who was the manufacturer's rep that you were
[14] dealing with from Sanofi?
[15]   **A.** I believe the representative at that time
[16] would have been a lady named Cheryl Bartos.
[17]   **Q.** B-a-r-t-o-s?
[18]   **A.** I believe that's the spelling, yes.
[19]   **Q.** Is she still with them?
[20]   **A.** Yes.
[21]   **Q.** Does she still deal with Walgreens?
[22]   **A.** Yes, she is our national account rep.
[23]   **Q.** And are you still selling this particular
[24] drug?

**Page 11**

[1]   **A.** Yes, we are.
[2]   **Q.** Do you know if it's for the same issues,
[3] medical issues?
[4]   **A.** I don't have any idea what it's being sold
[5] for, what doctors are prescribing it for.
[6]   **Q.** Well, do you know if it's changed since
[7] 2004, in terms of what this particular drug is
[8] indicated for?
[9]   **A.** No, I don't.
[10]   **Q.** Do you know if the warnings, the package
[11] insert warnings, if those have changed at all
[12] regarding this drug?
[13]   **A.** Yes, I do know that has changed.
[14]   **Q.** And how has it changed?
[15]   **A.** I can't give you exact, but I understand
[16] there was some issues in regards to vision
[17] problems.
[18]   **Q.** Anything else?
[19]   **A.** Not that I recall.
[20]   **Q.** Were you ever made aware that there had
[21] been some problems related to liver from this
[22] particular drug, Ketek?
[23]   **A.** Yes, I did know that.
[24]   **Q.** And how did you become aware of that?

**Page 12**

[1]   **A.** I think I understood that from the
[2] beginning, when the product was launched.
[3]   **Q.** What did you learn from the beginning when
[4] the product was launched, regarding liver issues
[5] related to Ketek?
[6]   **A.** I can't be specific, I don't know.
[7]   **Q.** Well, what do you mean you don't know, you
[8] already said you did know.
[9]   **A.** Well, I guess if you're asking me did I go
[10] into details and understand all the specifics
[11] behind the liver disease problems, I can't say I
[12] knew that. I knew that there were indications that
[13] the product may have side effects, which included
[14] liver problems.
[15]   **Q.** Liver problems that were reversible or
[16] irreversible?
[17]   **A.** Don't know, sir.
[18]   **Q.** Well, were you aware that back when the
[19] product was launched, that this particular drug,
[20] Ketek, could cause permanent liver problems?
[21]   **A.** I don't recall that.
[22]   **Q.** Were you aware that this drug Ketek could
[23] cause problems that could lead to death?
[24]   **A.** I don't recall that, no.

Page 13

[1] **Q.** Have you ever become aware that some of the
[2] studies involved with this particular drug that
[3] were submitted to the FDA involved fraud?
[4] **A.** No, sir.
[5] **Q.** Were you ever aware that at least one
[6] physician was prosecuted as a result of a study
[7] submitted, relative to this drug?
[8] **A.** Can you repeat that, you kind of broke up
[9] there. .
[10]             (Whereupon, the record was
[11]             read as requested.)
[12] **THE WITNESS:** No, I was not.
[13] **BY MR. POWER:**
[14] **Q.** Are you aware that there have been drugs
[15] associated with this drug related to liver failure?
[16] **A.** No.
[17] **Q.** And you're still not aware of it today?
[18] **A.** No.
[19] **Q.** And your company continues to sell this
[20] product?
[21] **A.** Yes, sir.
[22] **Q.** Are you -- strike that.
[23]             In your position would you be a person
[24] who would become aware of Med Watch Serious Adverse

Page 15

[1] **A.** We have a quality assurance division that
[2] works through our pharmacy operations. I would --
[3] my guess would be that an individual named Tom
[4] Lawler might be aware of those situations.
[5] **Q.** Where does Tom live?
[6] **A.** Chicago.
[7] **Q.** Have you reviewed any documents related to
[8] this matter?
[9] **A.** Just the affidavit here that I signed.
[10] **Q.** Have you reviewed anything like adverse
[11] reaction reports, plaintiff's complaint, any
[12] documents in preparation for this deposition?
[13] **A.** No.
[14] **Q.** Does Walgreens still do business in
[15] Illinois with Sanofi?
[16] **MR. CHILDERS:** Generally or with regard to this
[17] product?
[18] **MR. POWER:** Generally.
[19] **MR. CHILDERS:** Thank you.
[20] **THE WITNESS:** I guess you might have to clarify
[21] that for me when you talk about business. We sell
[22] Sanofi product, we may not have a financial
[23] relationship with that. I know that may be
[24] confusing.

Page 14

[1] Reaction Event reports?
[2] **A.** No.
[3] **Q.** Are you familiar with those reports?
[4] **A.** I've heard that name, but no, I'm not
[5] familiar with them.
[6] **Q.** Have you ever reviewed any medical articles
[7] or journals related to the drugs which your company
[8] sells?
[9] **A.** I read periodicals, Pharmacy Times and so
[10] forth, but that's about it.
[11] **Q.** Has the Pharmacy Times ever reported on
[12] serious adverse reactions related to liver problems
[13] from Ketek, as far as you're aware?
[14] **A.** Not as far as I'm aware.
[15] **Q.** Well, as you sit here today, are you aware
[16] of people ending up with serious liver problems
[17] related to this drug?
[18] **A.** No.
[19] **Q.** And as you sit here today, you're not aware
[20] of people dying from liver failure related to this
[21] drug?
[22] **A.** No.
[23] **Q.** Whose responsibility would it be at
[24] Walgreens to be aware of such things?

Page 16

[1] **BY MR. POWER:**
[2] **Q.** Well, do you have a financial relationship
[3] with some of the drug companies?
[4] **A.** From my area of purchasing, most of the
[5] products we buy into our stores are bought through
[6] a wholesaler, rather than direct from the
[7] manufacturer. So our financial relationship is
[8] with the wholesaler, not directly with the
[9] manufacturer.
[10] **Q.** And do you know why that is?
[11] **A.** Yes, from a purchasing aspect there is some
[12] logistical reasons to do that.
[13] **Q.** Explain it to us.
[14] **A.** They are able to supply quicker, faster,
[15] more accurately, rather than them shipping directly
[16] to our distribution centers for ultimate service to
[17] our stores, it's -- wholesalers do that better than
[18] the manufacturers themselves.
[19] **Q.** Is that because the wholesalers keep them
[20] in a warehouse or something?
[21] **A.** We have our own warehouses that supply our
[22] stores for certain products and they ship to our
[23] warehouses and then our warehouses supply our
[24] stores.

Page 17

[1]  Q. Who is the wholesaler for Walgreens here in
[2] Illinois?
[3]  A. We use all three of the major wholesalers,
[4] Cardinal Health, McKesson and Amerisource Bergen.
[5]  Q. Is there any particular one that you use
[6] regarding Ketek?
[7]  A. Ketek we buy through Cardinal Health into
[8] our distribution centers.
[9]  Q. How would it be that you would meet with
[10] the manufacturer for Sanofi, how would that come
[11] about?
[12]  A. They would call and schedule appointments
[13] with Sheila or Usra, to set up an appointment to
[14] discuss items or whatever.
[15]  Q. And would you be part of the meeting with
[16] them?
[17]  A. Sometimes.
[18]  Q. What parts of meetings would you
[19] participate in?
[20]  A. Typically I would go if there was something
[21] that was -- the rep may ask that I be there or the
[22] category manager, in this case Sheila may ask for
[23] me to be there, but in most instances if it was
[24] just a, what you would call a normal meeting that

Page 19

[1]  Q. Now, do you know much about the Sanofi
[2] company?
[3]  A. Not really.
[4]  Q. I mean, do you know where it's -- is it a
[5] French company or is it a U.S. company?
[6]  A. I know it's a European.
[7]  Q. Do you know what country in Europe?
[8]  A. No.
[9]  Q. Have you ever dealt with the people from
[10] Europe regarding the drug?
[11]  A. Not that I recall.
[12]  Q. Do you know if the Sanofi company is in
[13] good standing in Illinois?
[14]  A. I have no idea.
[15]  Q. Now, if -- you're part of the purchasing
[16] side of Walgreens, correct?
[17]  A. Correct.
[18]  Q. Do you, if, for example, there were an
[19] adverse reaction report come in from a pharmacist,
[20] that would not go to you, but it would go to the
[21] operations side, I take it, true?
[22]  A. How someone contacts our company could be
[23] through many areas, I guess, through regular
[24] hotline, it could come to somebody in the company.

Page 18

[1] happened quarterly to discuss business issues, I
[2] wouldn't be at those meetings.
[3]  Q. And why would you go to some of the
[4] meetings and not others?
[5]  A. They may have something specifically, a
[6] larger business issue that they may want to discuss
[7] with the higher level of management.
[8]  Q. Would it be fair to say that you're on the
[9] business side of Walgreens, rather than on the,
[10] what we would call the health side?
[11]  A. I am on the business side, the purchasing
[12] side.
[13]  Q. And what is the other side called? I call
[14] it the health side, but what's that called?
[15]  A. Operations, I would classify it.
[16]  Q. And who is head of the operations side?
[17]  A. I believe, we just had some changes, Don
[18] Hounker, vice president, is in charge of
[19] operations.
[20]  Q. How do you spell his last name?
[21]  A. H-o-u-n-k-e-r.
[22]  Q. And who is head of the purchasing side?
[23]  A. My boss is Frank DeStefano, vice president
[24] of RX purchasing.

Page 20

[1]  Q. Well, does Walgreens have a hotline?
[2]  A. Walgreens has a customer service line that
[3] customers call for any service issue.
[4]  Q. Well, if there was an adverse reaction is
[5] that the number they would call?
[6]  A. Not typically, I wouldn't think that would
[7] be the place to go, no.
[8]  Q. Well, where would be the place to go?
[9]  A. They would contact the local pharmacy at
[10] their store.
[11]  Q. And that local pharmacist, is there a
[12] system set up so he would notify someone of an
[13] adverse reaction?
[14]  A. There is a link within our system that
[15] allows -- that has addresses that they can report
[16] back to the manufacturer information on product
[17] defects.
[18]  Q. Are you in that line of notification or
[19] would that be the operations side?
[20]  A. That's on the operations side.
[21]  Q. Are you ever notified whether a pharmacist
[22] has had a complaint of an adverse reaction?
[23]  A. I have had pharmacists contact me and say
[24] they've had customer complaints and we direct them

Page 21

[1] to report it through the pharmacy -- the product
[2] defect reporting system.
[3]   Q.  And is that a Walgreens product defect
[4] reporting system?
[5]   A.  Yes.
[6]   Q.  And are you ever in the chain regarding the
[7] product defect reporting system at Walgreens?
[8]   A.  No.
[9]   Q.  That would be the operations side?
[10]   A.  I can't answer where -- who actually sees
[11] it from any other side.  The idea is it's supposed
[12] to be a reporting, it's how to contact the actual
[13] manufacturer by the pharmacist.  I can't tell you
[14] whether that -- if a pharmacist activates that and
[15] sends a report to a manufacturer, who else within
[16] the company would see that, I don't know if anyone
[17] does or if a number of people do, I have no idea.
[18]   Q.  Well, would it be fair to say if someone
[19] does receive notification of that, it would be on
[20] the operations side and not the purchasing side?
[21]   A.  I can say I don't receive anything through
[22] that system.
[23]   Q.  You make a statement, Walgreen exercised no
[24] control over the design and manufacture of Ketek

Page 22

[1] nor did Walgreens Company provide instructions or
[2] warnings of the manufacturer of said drug.  How
[3] would you know that?
[4]   A.  I can only speak for myself as a purchasing
[5] agent, we had no -- we had no contact with them on
[6] the design of the product at all.
[7]   Q.  Well, what about on the operations side, do
[8] you know whether the operations side had any
[9] contact with them at all?
[10]   A.  I don't know.
[11]   Q.  Are you aware when problems regarding liver
[12] disease first surfaced in reference to Ketek?
[13]   A.  I have an idea that it happened early to
[14] mid 2006 when information came out about the
[15] product having some problems.
[16]   Q.  And how do you know that?
[17]   A.  Simply by happenstance.  One of the
[18] functions that Sheila and I did was managing
[19] inventory.  We noticed that sales had went way down
[20] from a purchasing aspect and we had a lot of
[21] inventory on hand that we normally wouldn't have.
[22]         And just doing some research on why that
[23] went down, it was discovered that there was issues
[24] that had been arisen from Ketek and Sanofi, in

Page 23

[1] regard to some labeling issues, so we assumed
[2] obviously doctors now were aware of this and were
[3] not writing the product as frequently as before.
[4]   Q.  And when did that occur that you became
[5] aware that there was not as much purchasing of
[6] Ketek?
[7]   A.  Summer of last year is when it started and
[8] really fell off during the winter season.
[9]   Q.  So the summer of 2006?
[10]   A.  Yes.
[11]   Q.  Are you aware of whether or not there were
[12] cases of acute liver failure complained of in 2005,
[13] for example?
[14]   A.  No, I'm not aware of that.
[15]   Q.  Are you aware of whether there was any
[16] discussion, for example, at the FDA level,
[17] regarding insufficient studies by Sanofi?
[18]   A.  No.
[19]   Q.  Are you aware that the Ketek label has
[20] become relabeled at some point in time?
[21]   A.  Relabeled?  Can you clarify a little bit?
[22]   Q.  Well, you got a label, originally, with the
[23] product, right?
[24]   A.  Yeah.

Page 24

[1]   Q.  Is this a label that comes, you know --
[2]   A.  I think I know where you're going from,
[3] relabeled that it had maybe different indications,
[4] different side effects, is that what you mean?
[5]   Q.  Yes.
[6]   A.  Yes, we knew -- during the same time,
[7] during the summer, we did find out that there was a
[8] relabeling issue.
[9]   Q.  And what was the relabeling issue, if you
[10] know?
[11]   A.  I think I said that earlier, it had
[12] something to with vision.
[13]   Q.  Anything else?
[14]   A.  Not that I recall.
[15]   Q.  I think we talked about it earlier, you
[16] were unfamiliar with anyone dying as a result of
[17] taking this drug and causing liver failure, true?
[18]   A.  True.
[19]   Q.  And you were unaware of people ending up
[20] with serious permanent liver problems as a result
[21] of taking this drug, true?
[22]   A.  True.
[23]   Q.  And your position at Walgreens is such that
[24] you would not be the person to be in a position to

**Page 25**

[1] know if there were serious adverse reactions to
[2] this drug, true?
[3]   A.  We may become aware that somebody may pass
[4] on information about the adverse effects of a
[5] particular drug, we may.  I do not recall any
[6] information in regards to Ketek.
[7]   Q.  I understand that, but even if that
[8] information is passed on, it typically would not be
[9] passed on to you, generally speaking, but it would
[10] go to the operations end, true?
[11]   A.  I can't speak for them, what they see and
[12] what they get.
[13]   Q.  I understand that.  But if Walgreens gets
[14] anything, doesn't it typically go to operations
[15] rather than purchasing?
[16]   A.  I would say yes.
[17]   Q.  Have you ever been in the operations side
[18] of Walgreens?
[19]   A.  Yes, sir.
[20]   Q.  When was that?
[21]   A.  When I worked in the stores, that was
[22] considered operations and as a pharmacy supervisor
[23] as well, that was considered operations.
[24]   Q.  So the last time you were in operations was

**Page 26**

[1] when?
[2]   A.  Before I came here to Chicago and
[3] transferred up here, so 10, 11 years ago, 12 years
[4] ago.
[5]   Q.  Now, do you know, in terms of this Sanofi,
[6] whether or not they are a very large company or
[7] not?
[8]   A.  I would classify them as a large company,
[9] yes.
[10]   Q.  Well, are you aware their status in respect
[11] to Illinois has been revoked as a corporation?
[12]   A.  No, I have no awareness of that at all.
[13]   Q.  Are you aware that as of October of 2007,
[14] that they are no longer in good standing in
[15] Illinois?
[16]   A.  No, I have no awareness of that.
[17]   Q.  Do you know whether or not Sanofi is able
[18] to satisfy any judgment entered against it?
[19]   A.  I don't think I could comment on that, I
[20] wouldn't know.
[21]   Q.  Do you know if there has been any lawsuits
[22] filed against Sanofi as a result of this particular
[23] drug?
[24]   A.  I guess this civil case here, if that's

**Page 27**

[1] what you're talking about.
[2]   Q.  Other than this case.
[3]   A.  No, I don't know of any other cases.
[4]   Q.  Have you reviewed any journal articles
[5] regarding Ketek, such as the New England Journal of
[6] Medicine or Journal of Internal Medicine or
[7] anything of that nature?
[8]   A.  No.
[9]   Q.  Or the Annals of Internal Medicine
[10] regarding this drug, have you ever reviewed that?
[11]   A.  No.
[12]   Q.  And I may have asked you this, but are you
[13] aware whether or not originally one of the
[14] indications for this drug was a minor sinus
[15] infections?
[16]   A.  I think you did ask me, and I'm not -- I
[17] don't recall that that was one of the indications.
[18] Pneumonia was what I seem to remember, as an
[19] antibiotic, during the cough and cold season.
[20]   Q.  So whether it was indicated for things that
[21] were less serious than pneumonia, you don't know?
[22]   MR. CHILDERS: Objection, asked and answered.
[23] BY MR. POWER:
[24]   Q.  Is that correct?

**Page 28**

[1]   A.  That's correct.
[2]   Q.  Do you know whether or not it's a treatment
[3] for viral infections?
[4]   A.  No, I don't know.
[5]   Q.  Do you know whether it was indicated for
[6] acute bacterial sinusitis?
[7]   A.  No, I don't know.
[8]   Q.  Is acute bacterial sinusitis included
[9] amongst that minor sinus infection?
[10]   A.  I can't tell you the exact definition of
[11] what the difference is there.
[12]   Q.  Well, is bacterial sinusitis, do you know
[13] whether or not that is considered to be a minor
[14] sinus infection?
[15]   A.  I don't know.
[16]   Q.  And I think I asked you this, you're not
[17] aware of Sanofi's ability to satisfy any judgment,
[18] including a judgment in this case, correct?
[19]   A.  I would have no idea.
[20]   MR. POWER: As I understand, Jack, we're limiting
[21] this deposition to what is raised in the affidavit,
[22] correct?
[23]   MR. CHILDERS: I think you've gone beyond that a
[24] little bit, Joe, already, I say with a smile.  But

Page 29

[1]  I think that's correct, yes.

[2]         (Discussion off the record.)

[3]

[4]

[5]       FURTHER DEPONENT SAITH NOT. . .

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 30

[1]  STATE OF ILLINOIS )
                     ) SS:
[2]  COUNTY OF COOK   )
[3]      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - LAW DIVISION
[4]
     MAUREEN TOOMEY,            )
[5]                            )
              Plaintiff,       )
[6]                            )
       vs.                     ) No. 07 L 008730
[7]                            )
     SANOFI-AVENTIS U.S., INC., )
[8]  et al.                    )
                               )
[9]         Defendants.        )
[10]
[11]       This is to certify that I have read the
[12]  transcript of my deposition taken on the 27th day
[13]  of November 2007 in the foregoing cause, and that
[14]  the foregoing transcript accurately states the
[15]  questions asked and the answers given by me, with
[16]  the changes or corrections, if any, made on the
[17]  Errata Sheet(s) attached hereto.
[18]
[19]
[20]              WILLIAM GROTH
[21]         Subscribed and sworn to
              before me this      day
[22]         of               2007.
[23]
[24]              Notary Public

Page 31

[1]  STATE OF ILLINOIS )
                       ) SS:
[2]  COUNTY OF DU PAGE )
[3]          Barbara A. Parkovich being first duly
[4]  sworn on oath, says that she is a Certified
[5]  Shorthand Reporter, that she reported in shorthand
[6]  the testimony given at the taking of said
[7]  deposition, and that the foregoing is a true and
[8]  correct transcript of her shorthand notes so taken
[9]  as aforesaid and contains all the testimony given
[10]  by WILLIAM GROTH at said deposition.
[11]
[12]       And further, that she is not connected by
[13]  blood or marriage with any of the parties to this
[14]  action, nor is she a relative or employee or
[15]  attorney or counsel of any of the parties, or
[16]  financially interested directly or indirectly in
[17]  the matter in controversy.
[18]
[19]       That the preceding deposition shall be
[20]  read by said deponent, and any and all corrections
[21]  which the deponent desires to make shall be duly
[22]  made by the deponent on the enclosed errata
[23]  sheet(s), indicating page and line to be corrected,
[24]  and that the explanation, if any, given by the

Page 32

[1]  deponent for said corrections, shall be thereon
[2]  noted.
[3]
[4]               Barbara A. Parkovich
                 Certified Shorthand Reporter
[5]                  No. 084-004070
[6]
[7]              Subscribed and sworn to
                 before me this    day
                 of
[8]
[9]                 Notary Public
[10]
[11]
[12]          OFFICIAL SEAL
[13]          MARK JOHNSEN
[14]    NOTARY PUBLIC, STATE OF ILLINOIS
[15]    MY COMMISSION EXPIRES 12-16-2008
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Case 1:07-cv-07173    Document 11-2    Filed 01/25/2008    Page 42 of 45

Page 33

Page 33

**1**

10 26:3
11 26:3
12 26:3
13th 5:3
15 10:6
1951 5:3
1980 5:15

**2**

2 5:20
2004 9:14,17;11:7
2005 8:9,11;23:12
2006 22:14;23:9
2007 26:13

**5**

5 6:5,10

**6**

6 5:24

**A**

ability 28:17
able 16:14;26:17
account 10:22
accurately 16:15
Act 4:15
activates 21:14
actual 21:12
actually 21:10
acute 23:12;28:6,8
addresses 20:15
adverse 8:4;14:12;
  15:10;19:19;20:4,13,22;
  25:1,4
Adverse 13:24
affidavit 15:9;28:21
Again 6:10
against 26:18,22
agent 22:5
ago 10:6;26:3,4
ailments 9:18
allows 20:15
America 8:24
Amerisource 17:4
amongst 28:9
ANDA's 9:5
Annals 27:9
answered 27:22
antibiotic 9:20;27:19
applicable 4:13
appointment 17:13
appointments 17:12
approval 9:14
area 6:3;7:24;8:1;16:4
areas 19:23

arisen 22:24
articles 14:6;27:4
aspect 16:11;22:20
assistant 7:1
associated 13:15
assumed 23:1
assurance 15:1
attend 5:6
audibly 4:24
aware 9:9;11:20,24;
  12:18,22;13:1,5,14,17,
  24;14:13,14,15,19,24;
  15:4;22:11;23:2,5,11,14,
  15,19;25:3;26:10,13;
  27:13;28:17
awareness 26:12,16

**B**

back 5:22;7:10;10:12;
  12:18;20:16
bacterial 28:6,8,12
Bahlim 8:14
Bartos 10:16
B-a-r-t-o-s 10:17
became 25:3;7:3:4
become 11:24;13:1,24;
  23:20;25:3
begin 9:4,15
beginning 12:2,3
behind 12:11
Bennett 8:12,15
Bergen 17:4
better 16:17
beyond 28:23
birth 5:2
bit 23:21;28:24
born 5:4
boss 18:23
both 7:16
bought 16:5
brand 9:1
branded 7:17,20;8:12,
  17,22;9:1,6
Branded 8:23
broke 13:8
business 7:17,18,22;
  8:12,18;9:2,7;15:14,21;
  18:1,6,9,11
buy 16:5;17:7
buyer 6:16

**C**

California 5:8
call 17:12,24;18:10,13;
  20:3,5
called 4:3;5:23;18:13,
  14
came 22:14;26:2
can 20:15;21:21;22:4
Can 13:8;23:21
Canoga 5:7,7

Cardinal 17:4,7
case 17:22;26:24;27:2;
  28:18
cases 23:12;27:3
category 7:1,2,16;8:8,
  10,11;17:22
cause 12:20,23
causing 24:17
centers 6:18;7:20;
  16:16;17:8
certain 16:22
chain 21:6
changed 11:6,11,13,14
changes 18:17
charge 8:1;18:18
Cheryl 10:16
Chicago 6:12;8:16;
  15:6;26:2
CHILDERS 15:16,19;
  27:22;28:23
Circuit 4:15
civil 26:24
Civil 4:14
clarify 4:19;15:20;
  23:21
classify 18:15;26:8
cold 27:19
college 5:9
College 5:10
comment 26:19
companies 8:24;16:3
company 13:19;14:7;
  19:2,5,5,12,22,24;21:16;
  26:6,8
Company 6:2;7:4;22:1
complained 23:12
complaint 15:11;20:22
complaints 8:5;20:24
confusing 15:24
considered 25:22,23;
  28:13
contact 20:9,23;21:12;
  22:5,9
contacts 19:22
continues 13:19
contracts 7:22
control 21:24
Cook 4:15
corporate 6:13
corporation 26:11
cough 27:19
country 8:2,3;19:7
County 4:15
court 4:21
Court 4:14,15
current 7:12,13
customer 20:2,24
customers 20:3

**D**

date 5:2
deal 10:7,21

dealing 10:14
dealt 10:10;19:9
death 12:23
defect 21:2,3,7
defects 20:17
definition 28:10
department 6:14
departments 6:8
DEPONENT 29:5
deposition 4:12;15:12;
  28:21
design 21:24;22:6
DeStefano 18:23
details 9:22;12:10
diagnostic 7:3
difference 8:21;28:11
different 9:23;24:3,4
direct 16:6;20:24
directly 16:8,15
discovered 22:23
discovery 4:12
discuss 17:14;18:1,6
discussion 23:16
Discussion 29:2
disease 12:11;22:12
distribution 6:18;7:19;
  16:16;17:8
division 6:24;7:1,11;
  15:1
divisional 7:10
doctors 11:5;23:2
documents 15:7,12
Don 18:17
down 22:19,23
drug 8:18;9:11,16;10:8,
  9,24;11:7,12,22;12:19,
  22;13:2,7,15;14:17,21;
  16:3;19:10;22:2;24:17,
  21;25:2,5;26:23;27:10,
  14
drugs 13:14;14:7
duly 4:3
during 23:8;24:6,7;
  27:19
duties 6:19;7:14
dying 14:20;24:16

**E**

earlier 24:11,15
early 9:14,17;22:13
Edwin 4:10,12
effects 12:13;24:4;25:4
else 11:18;21:15;24:13
end 25:7
ending 14:16;24:19
England 27:5
entailed 6:17
entered 26:18
entire 8:2,3
Europe 19:7,10
European 19:6
even 25:7

Event 14:1
exact 11:15;28:10
EXAMINATION 4:5
examined 4:4
example 19:18;23:13,
  16
exercised 21:23
Explain 16:13

**F**

failure 13:15;14:20;
  23:12;24:17
fair 18:8;21:18
familiar 14:3,5
far 14:13,14
faster 16:14
FDA 9:5,13;13:3;23:16
fell 23:8
file 9:5
filed 26:22
filled 10:4
financial 15:22;16:2,7
find 24:7
first 4:3;6:15;9:12;
  10:12;22:12
follows 4:4
forth 14:10
Frank 18:23
fraud 13:3
French 19:5
frequently 23:3
full 4:8
functions 22:18
FURTHER 29:5

**G**

generally 25:9
Generally 15:16,18
generic 7:17,20;8:22;
  9:2,3,9
gets 25:13
Glazer 5:23
good 19:13;26:14
graduated 5:12
Groth 4:10,12,16
GROTH 4:2
group 6:6
guess 12:9;15:3,20;
  19:23;26:24
guessing 7:6

**H**

hand 22:21
happened 18:1;22:13
happenstance 22:17
head 4:23;18:16,22
health 18:10,14
Health 17:4,7
heard 14:4
herein 4:3

high 5:6
High 5:7
higher 18:7
hold 5:19
hotline 19:24;20:1
Hounker 18:18
H-o-u-n-k-e-r 18:21

**I**

idea 11:4;19:14;21:11,
17;22:13;28:19
illinois 4:14;7:24;
15:15;17:2;19:13;26:11,
15
include 8:18
included 8:1;12:13;
28:8
including 28:18
indicated 11:8;27:20;
28:5
indications 12:12;
24:3;27:14,17
individual 15:3
infection 28:9,14
infections 10:2;27:15;
28:3
information 20:16;
22:14;25:4,6,8
insert 11:11
instances 17:23
instructions 22:1
insufficient 23:17
internal 27:6,9
into 6:17,24;7:11,19;
12:10;16:5;17:7
inventory 22:19,21
involved 13:2,3
irreversible 12:16
issue 8:18;18:6;20:3;
24:8,9
issues 11:2,3,16;12:4;
18:1;22:23;23:1
items 17:14

**J**

Jack 28:20
Joe 28:24
journal 27:4
Journal 27:5,6
journals 14:7
judgment 26:18;28:17,
18
July 8:13

**K**

keep 16:19
Ketek 8:19;9:11;10:8;
11:22;12:5,20,22;14:13;
17:6,7;21:24;22:12,24;
23:6,19;25:6;27:5

kind 13:8
knew 12:12,12;24:6

**L**

label 23:19,22;24:1
labeling 23:1
lady 8:14;10:16
large 26:6,8
larger 18:6
last 10:4;18:20;23:7;
25:24
launched 9:13;12:2,4,
19
Lawier 15:4
lawsuits 16:21
lead 12:23
learn 12:3
least 13:5
less 27:21
level 18:7;23:16
limiting 28:20
line 20:2,18
link 20:14
little 23:21;28:24
live 15:5
liver 11:21;12:4,11,14,
20;13:15;14:12,16,20;
22:11;23:12;24:17,20
Liver 12:15
local 20:9,11
located 8:16
logistical 16:12
long 5:19;6:4,9;7:5
longer 26:14
lot 22:20
Louis 5:5,10,10,22;6:3,
7,8

**M**

major 17:3
making 9:4
management 6:7;18:7
manager 7:1,2,10;8:8,
10,11;17:22
managers 7:16
managing 22:18
manufacture 21:24
manufactured 8:24;
9:12
manufacturer 16:7,9;
17:10;20:16;21:13,15;
22:2
manufacturers 9:4,9;
16:18
manufacturer's 10:8,
10,13
many 19:23
matter 15:8
may 12:13;15:22,23;
17:21,22;18:5,6;25:3,3,
5;27:12

maybe 24:3
McKesson 17:4
mean 12:7;19:4;24:4
Med 13:24
medical 11:3;14:6
Medicare 5:23
Medicine 27:6,6,9
meet 17:9
meeting 17:15,24
meetings 17:18;18:2,4
mid 22:14
midwest 8:2
might 15:4,20
minor 10:1;27:14;28:9,
13
Missouri 5:5,11,18;6:7
months 5:24
more 16:15
most 16:4;17:23
moved 6:24;7:9,10
Moved 5:22
much 19:1;23:5
must 4:23
myself 22:4

**N**

name 4:8;8:14;9:1;
14:4;18:20
named 10:16;15:3
national 10:22
nature 8:5;27:7
New 27:5
next 6:22
nod 4:23
nor 22:1
normal 17:24
normally 22:21
notice 4:13
noticed 22:19
notification 20:18;
21:19
notified 20:21
notify 20:12
November 5:3
number 4:16;20:5;
21:17

**O**

Objection 27:22
obviously 7:24;23:2
occur 23:4
October 26:13
off 23:8;29:2
office 6:13
one 13:5;17:5;27:13,17,
One 22:17
only 9:6;22:4
operations 15:2;18:16,
19;19:21;20:19,20;21:9,
20;22:7,8,25:10,14,17,
22,23,24

Operations 18:15
ordering 6:17
originally 23:22;27:13
OTC 6:24
others 18:1
out 6:24;22:14;24:7
over 9:3;21:24
overseeing 6:7;7:2
own 16:21

**P**

package 11:10
Park 5:7,7
part 17:15;19:15
participate 17:19
particular 9:16;10:23;
11:7,22;12:19;13:2;17:5;
25:5;26:22
parts 17:18
pass 25:3
passed 25:8,9
past 10:11
patents 9:3
people 14:16,20;19:9;
21:17;24:19
periodicals 14:9
permanent 12:20;
24:20
person 13:23;24:24
pharmaceuticals
7:20,21
pharmacist 5:17;6:3;
19:19;20:11,21;21:13,14
pharmacists 20:23
pharmacy 5:23,23;6:6,
8;15:2;20:9;21:1;25:22
Pharmacy 5:10;14:9,
11
phonetic 8:14
physician 13:6
place 20:7,8
plaintiff's 15:11
please 4:8,18
pneumonia 9:24;27:21
Pneumonia 27:18
point 23:20
position 5:19;6:15,22;
7:12,13,15;13:23;24:23,
24
POWER 4:7;13:13;
15:18;16:1;27:23;28:20
Practice 4:14
preparation 15:12
prescribed 9:19;10:1
prescribing 11:5
prescription 9:16;10:5
present 8:9
president 18:18,23
probably 7:6
Probably 10:6
problems 9:21;11:17,
21;12:11,14,15,20,23;

14:12,16;22:11,15;24:20
product 8:23;9:4;
10:12;12:2,4,13,19;
13:20;15:17,22;20:16;
21:1,3,7;22:6,15;23:3,23
products 6:17;9:2;
16:5,22
prosecuted 13:6
provide 22:1
purchases 7:19
purchasing 6:14;7:3,
10;9:15;16:4,11;18:11,
22,24;19:15;21:20;22:4,
20;23:5;25:15
pursuant 4:13,13

**Q**

quality 15:1
quarterly 18:1
quicker 16:14

**R**

raised 28:21
rather 16:6,15;18:9;
25:15
reaction 8:4;15:11;
19:19;20:4,13,22
Reaction 14:1
reactions 14:12;25:1
read 13:11;14:9
really 19:3;23:8
reasons 16:12
recall 11:19;12:21,24;
19:11;24:14;25:5;27:17
receive 21:19,21
record 4:9,11,22;13:10;
29:2
recording 4:21
reference 22:12
reflect 4:11
regard 15:16;23:1
regarding 10:8;11:12;
12:4;17:6;19:10;21:6;
22:11;23:17;27:5,10
regards 11:16;25:6
regular 19:23
relabeled 23:20;24:3
Relabeled 23:21
relabeling 24:8,9
related 11:21;12:5;
13:15;14:7,12,17,20;
15:7
relationship 15:23;
16:2,7
relative 13:7
remember 27:18
rep 10:13,22;17:21
repeat 13:8
replaced 8:13
replenishment 6:16
report 7:18;19:19;

20:15;21:1,15
reported 14:11
reporter 4:21
reporting 21:2,4,7,12
reports 14:1,3;15:11
representative 10:15
reps 10:8,10
requested 13:11
research 22:22
respect 8:4;9:11;26:10
responsibilities 6:19;
7:15
responsibility 7:21;
14:23
result 13:6;24:16,20;
26:22
retail 5:23
retired 8:13
reversible 12:15
reviewed 14:6;15:7,10;
27:4,10
revoked 26:11
right 4:24;23:23
rules 4:14
Rules 4:15
RX 6:13,24;7:10,11;
18:24

**S**

SAITH 29:5
sales 22:19
same 9:4;11:2;24:6
Sanofi 8:24;9:6;10:14;
15:15,22;17:10;19:1,12;
22:24;23:17;26:5,17,22
Sanofi's 28:17
satisfy 26:18;28:17
schedule 17:12
school 5:6
School 5:7
season 23:8;27:19
seem 27:18
sees 21:10
sell 13:19;15:21
selling 10:23
sells 14:8
sends 21:15
Senior 4:10,12
serious 14:12,16;
24:20;25:1;27:21
Serious 13:24
service 16:16;20:2,3
set 17:13;20:12
Sheila 8:11,15;17:13,
22;22:18
ship 16:22
shipping 16:15
Shortly 9:17
side 7:17,17;8:12,17,
23;9:2,6;12:13;18:9,10,
11,12,13,14,16,22;
19:16,21;20:19,20;21:9,

11,20,20;22:7,8;24:4;
25:17
sides 8:22
signed 15:9
simply 6:17
Simply 22:17
single 9:1
sinus 10:1;27:14;28:9,
14
sinusitis 28:6,8,12
sit 14:15,19
situations 15:4
smile 28:24
sold 10:13;11:4
somebody 19:24;25:3
someone 19:22;20:12;
21:18
Sometimes 17:17
source 9:1
speak 22:4;25:11
speaking 25:9
specific 12:6
specifically 9:23;18:5
specifics 12:10
spell 18:20
spelling 10:18
Springfield 5:18
St 5:5,10,10,22;6:3,7,8
standing 19:13;26:14
started 23:7
state 4:8
statement 21:23
status 26:10
still 10:19,21,23;13:17;
15:14
store 20:10
stores 6:6,8;16:5,17,
22,24;25:21
straight 8:7
strike 13:22
studies 13:2;23:17
study 13:6
submitted 13:3,7
summer 23:9;24:7
Summer 23:7
supervisor 6:6;25:22
supplies 7:3
supply 16:14,21,23
supposed 21:11
Supreme 4:14
surfaced 22:12
sworn 4:1,4
system 20:12,14;21:2,
4,7,22

**T**

talk 15:21
talked 24:15
talking 27:1
terms 11:7;26:5
testified 4:4
thereafter 9:17

three 7:7;17:3
Times 14:9,11
title 6:16
today 4:17;13:17;
14:15,19
Tom 15:3,5
transfer 6:12
transferred 26:3
treatment 28:2
true 19:21;24:17,21;
25:2,10
True 24:18,22
try 4:19
types 9:24
typically 20:6;25:8,14
Typically 8:7;17:20

**U**

ultimate 16:16
unaware 24:19
under 9:4
understood 12:1
unfamiliar 24:16
up 13:8;14:16;17:13;
20:12;24:19;26:3
use 17:3,5
Usra 8:14;17:13

**V**

verbatim 4:21
vice 18:18,23
viral 28:3
vision 11:16;24:12
vitamins 7:3

**W**

Walgreen 21:23
Walgreens 6:2,13;7:4;
8:10;9:15;10:21;14:24;
15:14;17:1;18:9;19:16;
20:1,2;21:3,7;22:1;
24:23;25:13,18
warehouse 16:20
warehouses 16:21,23,
23
warnings 11:10,11;
22:2
Watch 13:24
way 22:19
what's 18:14
Whereupon 13:10
wholesaler 16:6,8;
17:1
wholesalers 7:22;
16:17,19;17:3
Whose 14:23
William 4:10,12
WILLIAM 4:2
winter 23:8
within 20:14;21:15

witness 4:3
Witness 4:1
WITNESS 13:12;15:20
work 5:17;6:2,13
worked 5:22;25:21
works 15:2
writing 23:3

**Y**

year 7:2;23:7
years 5:20;6:5,10;7:7;
10:6;26:3,3
young 8:14